## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAGNESITA REFRACTORIES COMPANY and BAKER REFRACTORIES I.C., INC.,** | : : : : | **CIVIL ACTION NO. 1:17-CV-1587** |
| | : | **(Chief Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TIANJIN NEW CENTURY REFRACTORIES CO., LTD., YINGKOU NEW CENTURY REFRACTORIES LTD., NEW CENTURY REFRACTORY SOLUTIONS INC., and DONALD GRIFFIN, an individual and doing business as TECHNICAL CONSULTANT LABORATORIES,** | : : : : : : : : : : : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiffs commenced this action asserting federal claims of trade secret

misappropriation, racketeering, and unfair competition as well as related state law

claims against a former employee and several competitors.  Before the court are two

defense motions to dismiss the amended complaint brought pursuant to Federal

Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6).  (Docs. 36, 37).

## I.    Factual Background & Procedural History

Plaintiff Magnesita Refractories Company ("Magnesita") is a Pennsylvania

company that manufactures and supplies various refractory products and materials

to producers of cement, glass, steel, and other metals.  (Doc. 33 ¶¶ 1-2).  Plaintiff

Baker Refractories I.C., Inc. is a Delaware company which holds trade secrets and

related intellectual property concerning the composition of fired and tempered dolomite brick products, the manufacturing and production processes for dolomite bricks, and "the optimization of brick properties and functionalities for a given process, particular application, [or] particular process conditions." (Id. ¶¶ 5-6, 38). Magnesita is the exclusive licensee of Baker Refractories I.C., Inc.'s intellectual property and researches, develops, manufactures, and sells insulating fired and tempered dolomite bricks worldwide. (Id. ¶¶ 3, 7, 36-37).

Defendant Donald Griffin ("Griffin") is a Pennsylvania resident. (Id. ¶ 8). J.E. Baker Company, a Magnesita predecessor, hired Griffin in August 1980. (Id. ¶¶ 47-49). On August 15, 1980, Griffin executed a "Secrecy Agreement" wherein he agreed not to make use of his employer's confidential information or to disclose it to any third party. (Id. ¶ 50; Doc. 8 at 18-21).[1] In February 2003, Griffin signed a "Confidentiality and Noncompetition Agreement" with LWB Refractories Company, another Magnesita predecessor. (Doc. 33 ¶¶ 47-48, 51; Doc. 8 at 23-26). Therein, Griffin agreed to not disclose his employer's confidential information and, upon cessation of employment, to "not take with him any document or paper containing Confidential Information." (Doc. 33 ¶¶ 49, 51; Doc. 8 at 24, 26).

Magnesita implements various security measures to safeguard its trade secrets and confidential information. (Doc. 33 ¶ 40). All employees must agree to

---

[1] Plaintiffs appended several exhibits to their original complaint filed on September 7, 2017. (See Docs. 7, 8, 9). Upon filing their amended complaint on November 22, 2017, plaintiffs neglected to refile these exhibits but did include an additional exhibit. (See Docs. 33, 33-1). The court will consider all exhibits attached to the original and amended complaints.

and sign Magnesita's "Code of Ethics" which extensively defines "confidential information" and prohibits distributing said information to third parties. (<u>Id.</u> ¶ 42; Doc. 8 at 2-14). Griffin acknowledged receipt of and agreed to abide by the Code of Ethics. (Doc. 33 ¶ 43; Doc. 8 at 16). Magnesita restricts access to confidential information stored on company computers to authorized persons through secure passwords and computer access profiles which allow Magnesita to tailor what confidential information each individual employees may access. (Doc. 33 ¶ 45). Confidential information may not be stored on public portions of Magnesita's network, and employees may not forward confidential information by email "without proper labeling and authorization." (<u>Id.</u> ¶ 46). Magnesita specifically prohibits the forwarding of confidential information to personal email accounts, and employees with access to confidential information are routinely required to sign nondisclosure agreements. (<u>Id.</u> ¶¶ 44, 46).

Throughout his nearly 35 years working for Magnesita and its predecessors, Griffin purportedly developed extensive knowledge of plaintiffs' trade secrets and other confidential information. (<u>Id.</u> ¶¶ 18, 49, 52, 59). Griffin held various positions in which he supervised research, development, and manufacture of numerous Magnesita products, requiring full access to plaintiffs' confidential information pertaining to fired and tempered dolomite brick technology. (<u>Id.</u> ¶¶ 18, 53). This confidential information included proprietary technology for brick composition, brick manufacturing conditions, and optimization processes (*e.g.*, optimization of thermal shock resistance). (<u>Id.</u> ¶ 52). From May 25, 2010 through 2014, Griffin served as Technology Director in Asia based in Shanghai, China. (<u>Id.</u> ¶¶ 56, 58).

Plaintiffs allege that during his tenure abroad as Technology Director, Griffin "made contact with one or more of" the codefendant companies: Tianjin New Century Refractories Co., Ltd. ("Tianjin"), Yingkou New Century Refractories Ltd. ("Yingkou"), and New Century Refractory Solutions Inc. ("New Century") (collectively, "the NCR defendants").  (Id. ¶ 57).  Tianjin and Yingkou are China-based companies with principal places of business in Tianjin and Liaoning Province, respectively.  (Id. ¶¶ 9-10).  New Century is a California corporation with its principal place of business therein.  (Id. ¶ 11).  Plaintiffs allege that these three NCR defendants are all commonly owned and controlled.  (Id. ¶ 12).  For a time, Tianjin claimed New Century as a subsidiary on its website.  (Id. ¶¶ 13-14).

Griffin returned to Magnesita's York, Pennsylvania location in 2014 as Research and Development and Quality Control Director for North America. (Id. ¶ 58).  According to the amended complaint, Griffin retired from Magnesita in December 2014.  (Id. ¶¶ 59-60).  During the six-month period immediately prior to his departure, Griffin purportedly forwarded to his personal email account numerous emails containing plaintiffs' trade secrets and confidential information. (Id. ¶¶ 61-63; Doc. 9 at 12-50).  He also allegedly downloaded plaintiffs' proprietary information to an external hard drive.  (Doc. 33 ¶ 65).  Griffin was self-employed

from January 2015 to September 2015.  (Id. ¶ 66).  Following this period of self-employment, the NCR defendants hired Griffin.[2]  (Id. ¶ 67).

The NCR defendants created a PowerPoint presentation in November 2016 to advertise their products to prospective customers.  (Id. ¶¶ 69, 84; see Doc. 7).  Plaintiffs aver that Griffin helped the NCR defendants to create this presentation.  (Doc. 33 ¶ 70).  The presentation represents that the NCR defendants have "Totally Foreign Upper Management" and displays brief biographies and photographs of three former Magnesita employees: Steve Hennel ("Hennel"), Griffin, and Greg Greiss ("Greiss").  (Id. ¶¶ 78-79; Doc. 7 at 8-11).  It lists various refractory products that the NCR defendants produce, including fired and tempered dolomite bricks, before stating that product "Formulations are all Foreign Technologies."  (Doc. 33 ¶ 80; Doc. 7 at 12).  The presentation closes with a slide of reasons that prospective customers should choose the NCR defendants as business partners, including that Tianjin has a "Chinese produced cost base but [is] under foreign management and Technology."  (Doc. 33 ¶ 81; Doc. 7 at 42).

Plaintiffs allege that Griffin provided their trade secrets and confidential information—the "foreign technology" referenced in the presentation—to the NCR defendants and that the NCR defendants now produce fired and tempered dolomite bricks which incorporate plaintiffs' proprietary information.  (Doc. 33 ¶¶ 75-76, 83-

---

[2] Plaintiffs do not provide an estimated start date for Griffin's employment with the NCR defendants.  In the amended complaint, plaintiffs allege that Griffin was hired several months before November 2016.  (Id. ¶ 69).  Plaintiffs attach a signed declaration to their briefing wherein Griffin claims he was hired by Tianjin in or about September 2015.  (Doc. 33-1 ¶ 5).

86).  Plaintiffs aver that the NCR defendants are selling fired and tempered dolomite bricks to plaintiffs' customers and that the NCR defendants were not producing these bricks prior to Griffin's hire.  (Id. ¶¶ 21, 84, 88-89, 94).  Plaintiffs identify Harbison Walker International ("Harbison Walker"), a Pennsylvania company, as one entity which purportedly purchases dolomite bricks incorporating plaintiffs' trade secrets from the NCR defendants.  (Id. ¶¶ 26-30).

Plaintiffs commenced this action with the filing of a complaint on September 6, 2017, subsequently filing an amended complaint on November 22, 2017.  Therein, plaintiffs assert seven counts against all defendants premised on defendants' alleged misappropriation of plaintiffs' trade secrets and other confidential information, to wit: misappropriation of trade secrets pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count I) and Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 PA. CONS. STAT. § 5301 et seq. (Count II); violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (Count III); unfair competition in violation of Lanham Act ("Lanham Act"), 15 U.S.C. § 1125 (Count V); and Pennsylvania common law claims of unfair competition (Count VI), conversion (Count VII), and civil conspiracy (Count VIII).  Plaintiffs also bring a breach of contract claim against Griffin (Count IV).

The NCR defendants move to dismiss the amended complaint for insufficient service of process, lack of personal jurisdiction, and failure to state a claim under Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6).  They also move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).  Griffin separately moves to dismiss the amended complaint for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6).  The motions are fully briefed and ripe for disposition.

## II.  <u>Legal Standard</u>

### A.  **Insufficient Service of Process**

Rule 4 of the Federal Rules of Civil Procedure "sets forth the procedure by which a court obtains personal jurisdiction over the defendant." <u>Ayres v. Jacobs & Crumplar, P.A.</u>, 99 F.3d 565, 569 (3d Cir. 1996).  The Rule prescribes the process for properly issuing and serving a summons.  FED. R. CIV. P. 4.  Pursuant to Rule 4, a summons must, *inter alia*, name each individual plaintiff and defendant and "be directed to the defendant."  FED. R. CIV. P. 4(a)(1)(A), (B).  When a complaint names more than one defendant, a separate summons "must be issued for each defendant to be served."  FED. R. CIV. P. 4(b).

A party may challenge the method of service or the lack of service of process under Federal Rule of Civil Procedure 12(b)(5).  FED. R. CIV. P. 12(b)(5); 5B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1353 (3d ed. 2018).  In a challenge to sufficiency of service, the burden of proof lies on the party asserting the validity of service.  <u>Grand Entm't Group, Ltd. v. Star Media Sales, Inc.</u>, 988 F.2d 476, 488 (3d Cir. 1993) (citation omitted).  The movant must be specific in its objections and identify the exact manner in which the plaintiff has failed to satisfy the summons or service provision utilized.  2 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.33[1] (3d ed. 2013).

## B.    Personal Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss a complaint for lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well-pleaded factual allegations in the plaintiff's favor. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992). The court's review is not limited to the face of the pleadings, as consideration of affidavits submitted by the parties is both appropriate and required. Patterson by Patterson v. F.B.I., 893 F.2d 595, 603-04 (3d Cir. 1990) (citation omitted); see Carteret Sav. Bank, 954 F.2d at 146.

Although the plaintiff bears the ultimate burden of proving personal jurisdiction over a defendant, Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), the plaintiff need not make such a showing at the pleading stage of litigation. Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009). In the absence of a hearing, a court must accept the plaintiff's jurisdictional allegations as true and construe any disputed facts in favor of the plaintiff. Id. (citations omitted); O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007). Once a defendant has challenged the court's exercise of personal jurisdiction, the plaintiff must "prov[e] by affidavits or other competent evidence that jurisdiction is proper." Metcalfe, 566 F.3d at 330 (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)). When claims of jurisdiction are not clearly frivolous, courts ordinarily allow jurisdictional discovery. See id. at 335-36

(citing <u>Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A.</u>

<u>d'Assurances</u>, 723 F.2d 357, 362 (3d Cir. 1983)).

**C.    Failure to State a Claim**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the

dismissal of complaints that fail to state a claim upon which relief may be granted.

FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the

court must "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief."  <u>Phillips v. County</u>

<u>of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker</u>, 292 F.3d at 374 n.7).

In addition to reviewing the facts contained in the complaint, the court may also

consider "matters of public record, orders, exhibits attached to the complaint and

items appearing in the record of the case."  <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d

Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d

1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

<u>Phillips</u>, 515 F.3d at 232 (alteration in original) (quoting <u>Bell Atl. Corp. v. Twombly</u>,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  <u>See</u> <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  <u>Id.</u> at 130 (alteration in original) (quoting

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

**III.  Discussion**

Defendants raise numerous challenges to the amended complaint.  The NCR defendants contend that plaintiffs failed to properly serve the amended complaint on Tianjin and Yingkou and that this court lacks personal jurisdiction over New Century.  All defendants challenge the sufficiency of each count in the amended complaint.  We begin with the NCR defendants' arguments regarding service of process and personal jurisdiction.

**A.  Service of Process**

Tianjin and Yingkou argue that plaintiffs failed to perfect service of the amended complaint on them.  Federal Rule of Civil Procedure 4(h)(1)(A) states that a party may serve a foreign corporation, partnership, or other unincorporated association in the manner prescribed by Rule 4(e)(1), to include "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  FED. R. CIV. P. 4(h)(1)(A), 4(e)(1).  Rule 4(h) also provides that a domestic or foreign corporation

may be served by "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." FED. R. CIV. P. 4(h)(1)(B).

Plaintiffs served all NCR defendants in California through Sue Shen, New Century's chief executive officer and an individual designated to accept service for New Century. (Doc. 31 ¶ 14; Docs. 20, 21, 22). Under California law, a corporation may be served by delivering the summons and complaint "[t]o . . . a general manager[] or a person authorized by the corporation to receive service of process." CAL. CIV. PROC. CODE § 416.10(b); see also CAL. CORP. CODE § 2110. The domestic subsidiary and distributor of a foreign company constitutes a "general manager" for purposes of service of process in California. See Falco v. Nissan N. Am. Inc., 987 F. Supp. 2d 1071, 1075 (C.D. Cal. 2013) (collecting cases). Tianjin and Yingkou do not dispute this principle,[3] (see Doc. 60), but they asseverate that New Century "is not and has never been a subsidiary of [Tianjin and Yingkou]," (Doc. 21 at 13; see also Doc. 31 ¶ 15). Despite this assertion, the record reflects that Tianjin represented on its website that New Century was a subsidiary, (Doc. 43-2 at 2), and that New Century was formed to "facilitate sales transactions" between Tianjin and Yingkou

---

[3] Tianjin and Yingkou contend that as Chinese companies, they must be served pursuant to the Hague Convention as set forth in Federal Rule of Civil Procedure 4(f)(1). (Doc. 40 at 8-9). Rule 4(f) governs service of an individual "at a place not within any judicial district of the United States." FED. R. CIV. P. 4(f). When service of process on a foreign defendant's domestic agent is "valid and complete under both state law and the Due Process Clause," the Hague Convention does not apply. See Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 707-08 (1988); Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1082 (E.D. Pa. 1992).

and customers in the United States, (Doc. 31 ¶ 15).  We find that Tianjin and

Yingkou received sufficient service of process through plaintiffs' service on New

Century.

### B.     Personal Jurisdiction

A federal court may assert personal jurisdiction over a nonresident of the

forum state to the extent authorized by the law of the forum.  <u>See</u> FED. R. CIV. P.

4(k)(1)(A).  The Pennsylvania Long-Arm Statute grants jurisdiction coextensive

with that permitted by the Due Process Clause of the Fourteenth Amendment.

42 PA. CONS. STAT. § 5322(b).  Our constitutional inquiry is guided by the "minimum

contacts" test established in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310

(1945).  Under this test, the plaintiff must show that the nonresident defendant has

"certain minimum contacts with [the forum] such that the maintenance of the suit

does not offend traditional notions of fair play and substantial justice."  <u>Int'l Shoe</u>,

326 U.S. at 316 (internal quotation marks and citation omitted); <u>see also</u> <u>Marten</u>

<u>v. Godwin</u>, 499 F.3d 290, 296 (3d Cir. 2007).  The focus of the minimum contacts

analysis is "the relationship among the defendant, the forum, and the litigation,"

<u>Shaffer v. Heitner</u>, 433 U.S. 186, 204 (1977), such that the defendant has fair warning

that he may be subject to suit in that forum.  <u>Marten</u>, 499 F.3d at 296; <u>Gen. Elec. Co.</u>

<u>v. Deutz AG</u>, 270 F.3d 144, 150 (3d Cir. 2001).  "[T]he mere unilateral activity of those

who claim some relationship with a nonresident defendant cannot satisfy the

requirement of contact with the forum State."  <u>World-Wide Volkswagen Corp.</u>

<u>v. Woodson</u>, 444 U.S. 286, 298 (1980) (internal citation omitted).

A federal court must possess one of two forms of personal jurisdiction to comport with these principles.  See D'Jamoos *ex rel.* Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-15 (1984)).  General jurisdiction allows a court to exercise jurisdiction over all claims against a party that possesses contacts with the forum state so "'systematic and continuous' as to render them essentially at home" therein.  Daimler AG v. Baumen, 571 U.S. 117, 127 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (citing Helicopteros, 466 U.S. at 414 n.9)); Chavez v. Dole Food Co., Inc., 836 F.3d 205, 223 (3d Cir. 2016) (*en banc*).  Specific jurisdiction, on the other hand, allows the court to hear only claims arising out of or relating to the defendant's contacts with the forum state. Helicopteros, 466 U.S. at 414 n.8; Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006).

New Century avers that it has insufficient contacts with Pennsylvania to establish specific personal jurisdiction therein and further that Pennsylvania district courts may not exercise general jurisdiction over it.  Plaintiffs rejoin that New Century has purposefully availed itself of the forum and, alternatively, that Tianjin's and Yingkou's contacts with Pennsylvania are properly imputed to New Century under an "alter ego" theory of general personal jurisdiction.

### 1. *Specific Personal Jurisdiction*

To exercise specific jurisdiction over a defendant, the court must find that (1) the defendant purposefully directed its activities at the forum, (2) each cause of action "arise[s] out of or relate[s] to at least one" of the defendant's activities, and

(3) the exercise of jurisdiction "comport[s] with fair play and substantial justice."

D'Jamoos, 566 F.3d at 102 (internal quotation marks and citations omitted);

O'Connor, 496 F.3d at 317.  The purposeful availment and relatedness inquiries are

often described as requiring "minimum contacts" between the defendant and the

relevant forum.  *In re* Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538,

558 (M.D. Pa. 2009) ("Chocolate I") (Conner, J.) (citing Toys "R" Us, Inc. v. Step

Two, S.A., 318 F.3d 446, 451 (3d Cir. 2003)).  The defendant must have "purposefully

avail[ed] itself of the privilege of conducting activities within the forum," but

physical presence within the forum is not required.  O'Connor, 496 F.3d at 317

(quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)) (citing Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 475 (1985)).  "Unilateral activity" by a plaintiff "claim[ing]

some relationship with a nonresident defendant" is insufficient to establish that the

defendant purposely directed its activities at the forum.  D'Jamoos, 566 F.3d at 103

(quoting Hanson, 357 U.S. at 253); O'Connor, 496 F.3d at 317.  Determinations of

specific jurisdiction are generally claim specific because "the analysis depends on

the relationship between the claims and contacts."  Martin, 499 F.3d at 296 (citing

Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001) (collecting cases)).

The court must also inquire whether the exercise of jurisdiction comports

with "traditional notions of fair play and substantial justice."  See Int'l Shoe, 326

U.S. at 316.  Jurisdiction is presumptively constitutional upon a finding of minimum

contacts, and the defendant "must present a compelling case that the presence of

some other considerations would render jurisdiction unreasonable."  See Burger

King, 471 U.S. at 477.  Showing an absence of fairness or lack of substantial justice

requires the defendant to overcome a heavy burden. <u>Grand Entm't Grp.</u>, 988 F.3d at 483. To determine jurisdictional reasonableness, the court must balance the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining efficient relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. <u>O'Connor</u>, 496 F.3d at 324 (citing <u>Burger King</u>, 471 U.S. at 477).

The NCR defendants aver that insufficient contacts exist between New Century and the Commonwealth of Pennsylvania to justify an exercise of specific personal jurisdiction. In a sworn affidavit, Tianjin's managing director Yong S. Dai, Ph.D ("Dr. Dai"), states that no dolomite bricks were ever manufactured in, distributed to, or sold in Pennsylvania. (Doc. 31 ¶¶ 15-16). Dr. Dai attests that the Pittsburgh area phone number listed for New Century on Tianjin's website is merely a reference "to a former [] sales consultant and his cell phone number." (Doc. 31 ¶ 17).

As evidence of purposeful availment, plaintiffs provide the NCR defendants' presentation slides which indicate that Tianjin partners with and utilizes Harbison Walker, a Pennsylvania company, as a "sourcing agent" and "sales agent." (Doc. 7 at 5). Plaintiffs also demonstrate that, on previous iterations of its website, Tianjin identified New Century as a subsidiary and marketed its dolomite brick products to customers by listing a Pittsburgh area phone number associated with New Century. (Doc. 33 ¶ 28; Doc. 43-2 at 2; Doc. 43-3 at 2). But Tianjin's website does not appear to be "directly target[ed]" at Pennsylvania consumers, <u>see</u> <u>Toys "R" Us</u>, 318 F.3d at

454; see also Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997), and use of a sales representative with a phone number bearing a Pennsylvania area code is insufficient to establish that New Century purposefully availed itself of the benefits and privileges of conducting business in the state. Moreover, plaintiffs adduce no evidence in support of their bare allegation that New Century sold dolomite brick products to Pennsylvania residents through Harbison Walker or otherwise.  (Doc. 33 ¶ 26).  At this juncture, plaintiffs have failed to "establish[] jurisdictional facts through sworn affidavits or other competent evidence" as to New Century.  Patterson, 893 F.2d at 604 (citation omitted).

### 2. *Alter Ego Relationship*

A plaintiff may assert an alter ego relationship between a parent company and its subsidiary as an alternate basis for general personal jurisdiction over a defendant.  *In re* Chocolate Confectionary Antitrust Litig., 674 F. Supp. 2d 580, 598 (M.D. Pa. 2009) ("Chocolate II") (Conner, J.).  The hallmarks of an alter ego relationship are invasive control by a parent corporation over its subsidiary and disregard for traditional corporate boundaries.  See 16 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 108.42 (3d. ed. 2012).  Such control must exceed the usual supervision that a parent exercises over a subsidiary.  See Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300-01 (3d Cir. 2008); Chocolate II, 674 F. Supp. 2d at 598 (citing Simeone *ex rel.* Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005)).  Hence, to establish an alter ego scenario, the parent company's control must go beyond mere monitoring of the subsidiary's business plans and profitability; it must rise to the level of interference

with the subsidiary's day-to-day operations.  See United States v. Bestfoods, 524

U.S. 51, 69 (1998).  If a parent and subsidiary continue to respect traditional

corporate boundaries by maintaining, for example, their own bylaws, articles of

incorporation, and boards of directors, "the subsidiary will not be deemed to be the

'alter ego' of the parent, no matter how much control the parent exercises."  Poe v.

Babcock Int'l, PLC, 662 F. Supp. 4, 6 (M.D. Pa. 1985).

Courts evaluate corporate dependence in light of whether:

> (1) the parent owns all or a significant majority of the
> subsidiary's stock,
> (2) commonality of officers or directors exists between the
> two corporations,
> (3) the group possesses a unified marketing image,
> including common branding of products,
> (4) corporate insignias, trademarks, and logos are uniform
> across corporate boundaries,
> (5) group members share employees,
> (6) the parent has integrated its sales and distribution
> systems with those of its subsidiaries,
> (7) the corporations exchange or share managerial or
> supervisory personnel,
> (8) the subsidiary performs business functions that would
> ordinarily be handled by a parent corporation,
> (9) the parent uses the subsidiary as a marketing division
> or as an exclusive distributor, and
> (10) the parent exercises control or provides instruction to
> the subsidiary's officers and directors.

Chocolate II, 674 F. Supp. 2d at 598 (quoting Chocolate I, 602 F. Supp. 2d at 569-70);

Simeone, 360 F. Supp. 2d at 675)); accord Genesis Bio. Pharms. v. Chiron Corp., 27

F. App'x 94, 98 (3d Cir. 2002) (nonprecedential).  No single factor is dispositive.

Simeone, 360 F. Supp. 2d at 675.  The court may also consider any evidence bearing

on the corporations' functional interrelationship.  Id.  Plaintiffs may rely upon an

alter ego connection to acquire jurisdiction over either a nonresident parent or a

nonresident subsidiary based upon their relationship with an in-forum entity. Chocolate I, 602 F. Supp. 2d at 570; Simeone, 360 F. Supp. 2d at 675.

Plaintiffs' proffered evidence strongly suggests a parent-subsidiary relationship between Tianjin and New Century. Tianjin's website represented that New Century was a subsidiary and referred to New Century as "TNCR US." (Doc. 43-2 at 2; Doc. 43-3 at 2). For an undetermined period of time, Dr. Dai served contemporaneously as a director and officer of New Century and as Tianjin's managing director. (See Doc. 31 ¶¶ 3, 13). New Century was formed "to facilitate transactions between [Tianjin and Yingkou] and two buyers located on the West Coast of the United States." (Id. ¶ 15). All three NCR defendants share a unified marketing image through use of the shared trade name "New Century Refractories."[4] (Id. ¶¶ 2, 7, 10).

This evidence fails, however, to demonstrate that Tianjin exercises actual and substantial control over New Century's daily activities. It is unclear whether Tianjin possesses a controlling interest in New Century, the extent to which the two corporations currently share officers or directors aside from Dr. Dai, or whether the corporations share or exchange managerial personnel. Tianjin and New Century personnel do share a common address in California, (see Doc. 43-6 at 2), but this fact alone does not elucidate the working relationship between said personnel and the respective companies. Plaintiffs speculate that Tianjin exercises control or

_____

[4] Plaintiffs assert that New Century is associated with Tianjin's "design mark" or logo. (Doc. 43 at 14). However, the images of Tianjin's website indicate that New Century has a separate, distinct logo. (See Doc. 43-2 at 2; Doc. 43-3 at 2).

provides instruction to New Century's officers and directors but provide no insight

as to the scope of New Century's autonomy within the parent-subsidiary

relationship. New Century cannot be subject to alter ego jurisdiction absent

additional evidence that Tianjin's control over New Century rises to the level of

interference with traditional corporate boundaries and governance.

### 3. *Jurisdictional Discovery*

The court has a responsibility to assist plaintiffs by allowing jurisdictional

discovery unless the assertion of personal jurisdiction is "clearly frivolous." Toys

"R" Us, 318 F.3d at 456 (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,

107 F.3d 1026, 1042 (3d Cir. 1997)). A plaintiff need only set forth factual allegations

that suggest "with reasonable particularity" the possible existence of the requisite

"contacts between the party and the forum state." Mellon Bank, 960 F.2d at 1223;

see also Toys "R" Us, 318 F.3d at 456. General allegations that defendants transact

business in the forum do not entitle plaintiffs to jurisdictional discovery; plaintiffs

must produce evidence suggesting that discovery will bear fruit. Brown v. AST

Sports Sci., Inc., No. 02-1682, 2002 WL 32345935, at *10 (E.D. Pa. June 28, 2002)

(citations omitted); see also Base Metal Trading Ltd. v. OJSC "Novokuznetsky

Aluminum Factory", 47 F. App'x 73, 77 (3d Cir. 2002) (nonprecedential). A court

weighing a jurisdictional discovery request must "accept the plaintiff's allegations

as true, and . . . construe disputed facts in favor of the plaintiff." Toys "R" Us, 318

F.3d at 457 (citation omitted).

The NCR defendants do not oppose plaintiffs' request for jurisdictional

discovery. (See Doc. 60; Doc. 43 at 18). Plaintiffs adduce sufficient evidence to

warrant jurisdictional discovery on both the purposeful availment and alter ego inquiries. Jurisdictional discovery may confirm plaintiffs' *allegata* concerning a Pennsylvania sourcing agent or sales of dolomite brick products to Pennsylvania residents. And plaintiffs have made an adequate preliminary showing of a parent-subsidiary relationship with certain indicia of control between Tianjin and New Century to support alter-ego discovery as well. Plaintiffs' assertion of jurisdiction is not "clearly frivolous." Toys "R" Us, 318 F.3d at 456 (citing Mass. School of Law at Andover, Inc., 107 F.3d at 1042). We will grant plaintiffs' request for jurisdictional discovery.

## C. Failure to State a Claim

### 1. *Trade Secret Misappropriation Against All Defendants*

The DTSA and PUTSA define misappropriation as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A); 12 PA. CONS. STAT. § 5302. Both statutes protect information—*e.g.*, patterns, compilations, formulas, methods, and processes—(1) that the owner has taken reasonable efforts to keep secret and (2) that derives independent economic value, actual or potential, from remaining secret. See 18 U.S.C. § 1839(3)(A)-(B); 12 PA. CONS. STAT. § 5302. As a threshold matter, defendants contend that plaintiffs' federal misappropriation claim is not cognizable because the alleged wrongful conduct occurred prior to the DTSA's enactment. Defendants also argue that plaintiffs have not identified any

trade secrets, taken reasonable steps to preserve the secrecy of said trade secrets, or pointed to any acts of misappropriation.

The DTSA's civil remedies do not reach acts of misappropriation that occur entirely before the statute's May 11, 2016 enactment date. Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376 (2016). However, the DTSA does apply to "any misappropriation of a trade secret . . . for which any act occurs on or after the date of enactment of this Act." PDC Machs. Inc. v. Nel Hydrogen A/S, No. 17-5399, 2018 WL 3008531, at *3 (E.D. Pa. June 15, 2018) (quoting Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376 (2016)). A trade secret owner may bring an action against a defendant whose acquisition of a trade secret occurred before the statute's enactment date if use of the misappropriated trade secret continued thereafter. 123 Exteriors, Inc. v. N. Star Exteriors, LLC, No. 17-4337, 2018 WL 3642221, at *6 (E.D. Pa. Aug. 1, 2018) (collecting cases); PDC Machs., 2018 WL 3008531, at *3 (same).

Defendants correctly note that Griffin purportedly acquired plaintiffs' trade secrets in late 2014 before the DTSA became law. (Doc. 41 at 8; Doc. 33 ¶¶ 59, 61-62, 65). Hence, any claim based on acquisition of trade secrets before May 11, 2016 must be dismissed. Nevertheless, plaintiffs adequately allege that the NCR defendants continued to use trade secrets provided by Griffin well after the DTSA's enactment. (See Doc. 33 ¶¶ 78-94). The NCR defendants were actively marketing their fired and tempered dolomite bricks in November 2016, and plaintiffs allege that Harbison Walker purchased dolomite bricks incorporating plaintiffs' trade secrets from the NCR defendants. (Id. ¶¶ 26, 80; Doc. 7 at 12). Moreover, it is

plausible that Griffin continued to facilitate the NCR defendants' misuse or disclosure of plaintiffs' trade secrets beyond the DTSA's enactment date. (See Doc. 33 ¶ 64). Plaintiffs' federal trade secret misappropriation claim is cognizable as pled.

We also reject defendants' contention that plaintiffs inadequately identify the subject trade secrets. A robust consensus of district courts within the Third Circuit have held that a party alleging misappropriation in violation of PUTSA need not describe trade secrets with particularity to survive Rule 12 scrutiny. Certainteed Ceilings Corp. v. Aiken, No. 14-3925, 2015 WL 410029, at *5 (E.D. Pa. Jan. 29, 2015); Mattern & Assocs., LLC v. Latham & Watkins LLP, No. 13-6592, 2014 WL 4804068, at *3 (E.D. Pa. Sept. 26, 2014); Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2012 WL 4205476, at *27 (E.D. Pa. Sept. 19, 2012) (collecting cases). To require a detailed description of an allegedly misappropriated trade secret in a complaint "would result in public disclosure of the purported trade secret."[5] Mattern, 2014 WL 4804068, at *3 (internal quotation marks and citations omitted). In the two years since the DTSA's enactment, district courts across the country have applied a

---

[5] The NCR defendants move for a more definite statement under Federal Rule of Civil Procedure 12(e), specifically asking the court to require plaintiffs to file an amended pleading with unredacted copies of exhibits. (Doc. 40 at 21). In the absence of a protective order, this request is premature and risks the public disclosure of plaintiffs' trade secrets and confidential information. We will deny the NCR defendants' motion for a more definite statement without prejudice to their right to seek unredacted exhibits at a more appropriate time.

similar standard to federal misappropriation claims at the Rule 12 stage.[6]  See, e.g.,

Alta Devices, Inc. v. LG Elecs., Inc., No. 18-CV-404, 2018 WL 5045429, at *8 (N.D.

Cal. Oct. 17, 2018); S. Field Maint. & Fabrication LLC v. Killough, No. 2:18-CV-581,

2018 WL 4701782, at *3-4 (M.D. Ala. Oct. 1, 2018) (citing Wells Lamont Indus. Grp.

LLC v. Richard Mendoza & Radians, Inc., No. 17-1136, 2017 WL 3235682, at *3 (N.D.

Ill. July 31, 2017)); see also Chubb Ina Holdings Inc. v. Chang, No. 16-2354, 2017 WL

499682, at *10 (D.N.J. Feb. 7, 2017).

The amended complaint identifies, in general terms, the methods and

processes that constitute plaintiffs' trade secrets.  Griffin allegedly forwarded emails

to his personal account containing information about refractory compositions of

and manufacturing processes and machinery parameters for plaintiffs' fired and

tempered dolomite brick products.  (Doc. 33 ¶¶ 4, 6, 38, 61-64, 104).  He purportedly

acquired information about "the optimization of brick properties and functionality"

for a given process, application, or process conditions, as well as confidential

marketing and sales information.  (Id. ¶¶ 4, 6, 38, 63-64, 104).  This wrongfully

obtained information is the product of plaintiffs' decades of "experience and

---

[6] In support of the proposition that plaintiffs must plead trade secrets with
particularity, defendants cite to Synygy, Inc. v. ZS Associates, Inc., No. 07-3536,
2013 WL 3716518 (E.D. Pa. July 15, 2013).  (Doc. 41 at 9).  In Synygy, the court
partially granted a motion to compel discovery responses, ordering the plaintiff to
provide supplemental interrogatory responses "setting forth with reasonable
particularity the trade secrets" allegedly misappropriated.  Synygy, 2013 WL
3716518, at *5.  The Synygy opinion was rendered in a different procedural posture
and with an eye toward trial.  See id. at *2.  It is inapposite.

extensive research and development efforts." (Id. ¶ 38). Plaintiffs have sufficiently identified the misappropriated trade secrets to survive Rule 12 scrutiny.

Plaintiffs also took reasonable steps to protect their trade secrets. All Magnesita employees must sign and consent to abide by a "Code of Ethics and Conduct." (Id. ¶ 41; see Doc. 8 at 2-14). The code defines "confidential information" and proscribes its disclosure to third parties. (Doc. 33 ¶ 42; Doc. 8 at 5-6). Employees needing access to Magnesita's confidential information must execute nondisclosure agreements or secrecy agreements, and Magnesita utilizes secure passwords and tailored "access profiles" to further control each employee's access to trade secrets. (Doc. 33 ¶¶ 44-45; see id. ¶¶ 43, 50-51; Doc. 8 at 18-21, 24-26). Plaintiffs represent that Magnesita prohibits employees from forwarding confidential information to a personal email account or by email generally without proper labeling and authorization, and that confidential information may not be stored "on any public portion of [Magnesita's] network." (Doc. 33 ¶ 46). Plaintiffs have stated a plausible claim for misappropriation of trade secrets against Griffin, Tianjin, and Yingkou.

### 2. *Civil RICO Against All Defendants*

RICO creates a civil remedy for "[a]ny person injured in his [or her] business or property" by violating the statute's substantive provisions. 18 U.S.C. § 1964(c). To state a civil RICO claim, a plaintiff must allege

> (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant

> participated through a pattern of racketeering activity
> that included at least two racketeering acts.

Annulli v. Panikkar, 200 F.3d 189, 198 (3d Cir. 1999) (citations omitted); see also

Munsif v. Cassel, 331 F. App'x 954, 958 (3d Cir. 2009) (nonprecedential).  Defendants

challenge several aspects of plaintiffs' civil RICO claim.  Our inquiry begins and

ends with the predicate act element.

The RICO statute identifies numerous federal and state criminal acts that

may constitute racketeering activity, including theft of trade secrets.  18 U.S.C.

§ 1961(1) (citing 18 U.S.C. § 1832).  Theft of trade secrets became a predicate act on

May 11, 2016, with the enactment of the DTSA.  Defend Trade Secrets Act of 2016,

Pub. L. No. 114-153, § 3(b), 130 Stat. 376 (2016).  A person commits theft of trade

secrets when he or she, with intent to convert the trade secret, knowingly does one

of the following:

> (1) steals, or without authorization appropriates, takes,
> carries away, or conceals, or by fraud, artifice, or
> deception obtains such information;
>
> (2) without authorization copies, duplicates, sketches,
> draws, photographs, downloads, uploads, alters, destroys,
> photocopies, replicates, transmits, delivers, sends, mails,
> communicates, or conveys such information;
>
> (3) receives, buys, or possesses such information, knowing
> the same to have been stolen or appropriated, obtained,
> or converted without authorization;
>
> (4) attempts to commit any offense described in
> paragraphs (1) through (3); or
>
> (5) conspires with one or more other persons to commit
> any offense described in paragraphs (1) through (3), and
> one or more of such persons do any act to effect the object
> of the conspiracy.

18 U.S.C. § 1832(a)(1)-(5).  The trade secret must be related to a product or service used in interstate commerce, the theft must benefit someone other than the rightful owner, and the party stealing the trade secret must do so "intending or knowing that the offense will[] injure any owner of that trade secret."  Id. § 1832(a).

The parties proffer different interpretations of how to quantify predicate acts premised on alleged theft of trade secrets.  Defendants argue that the amended complaint sets forth "a single scheme to allegedly misappropriate Plaintiffs' trade secrets," constituting only one predicate act.  (Doc. 41 at 13; see also Doc. 40 at 16).  This interpretation severely limits the reach of the DTSA, which sets forth multiple, distinct ways one can commit theft of trade secrets, including (1) outright theft, (2) use or disclosure, and (3) knowing receipt of a stolen or wrongfully obtained trade secret.  See 18 U.S.C. § 1832(a)(1)-(3).[7]  Nor are we persuaded by plaintiffs' view that each occurrence of "use activity"—e.g., "copying, downloading, uploading, sending, communicating, conveying, and possessing"—constitutes a separate predicate act.  (Doc. 42 at 15 (citing 18 U.S.C. § 1832)).  Plaintiffs acknowledge that under their interpretation, "each dolomite brick produced . . . incorporating Plaintiffs' stolen trade secrets constitutes a predicate act under RICO."  (Doc. 42 at 15).  Indeed, this reading would transform nearly every DTSA case into a RICO matter, often involving an infinite number of predicate acts premised on each item

---

[7] Neither the facts of this case nor the court's analysis implicates Section 1832's attempt or conspiracy provisions.  See 18 U.S.C. § 1832(a)(4)-(5).

manufactured or sale made using another's trade secret.[8]  Because we find that a

more fundamental pleading deficiency requires dismissal under Rule 12(b)(6), we

need not resolve the parties' competing views at this time.

Griffin allegedly stole plaintiffs' trade secrets in 2014 which contravenes

Section 1832(a)(1), and then disclosed those trade secrets to the NCR defendants

around the time he began employment therewith in violation of Section 1832(a)(2).

(Id. ¶¶ 61-65, 83, 130-31).  The NCR defendants allegedly received these trade secrets

knowing that Griffin unlawfully acquired them in violation of Section 1832(a)(3),

and then used those trade secrets in violation of Section 1832(a)(2).  (Id. ¶¶ 83, 92,

132).  The trouble with plaintiffs' allegations is that it is not at all clear whether each

of the claimed predicate acts occurred at a time when they were deemed predicate

acts under federal law.  Griffin's purported theft occurred in the six months before

he retired from Magnesita in December 2014, well before theft of trade secrets

became a RICO predicate on May 11, 2016.  (Id. ¶¶ 59-63, 65).  Plaintiffs also allege

that the NCR defendants hired former Magnesita employees including Griffin to

obtain access to plaintiffs' trade secret information.  (Id. ¶ 140).  Beyond alleging

---

[8] Given the recent enactment of the DTSA, there is a dearth of authority in
the Third Circuit on this issue.  At least one court has suggested summarily that
each individual use of a trade secret may be a separate RICO predicate.  See Brand
Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp., No. 16-2499, 2017 WL
1105648, at *12 (E.D. Pa. Mar. 24, 2017).  Another court, in the context of a civil claim
for trade secret misappropriation, opined that the separate activities of acquisition,
use, and disclosure "may be taken together to constitute a single misappropriation
if the misappropriations are related."  Christian v. Lannett Co., Inc., No. 16-963,
2018 WL 1532849, at *4 (E.D. Pa. Mar. 29, 2018) (citing 18 U.S.C. § 1839(5); Brand
Energy, 2017 WL 1105648, at *4).

that Tianjin hired Griffin in September 2015—again, before enactment of the DTSA—plaintiffs provide no insight in their amended complaint as to *when* Griffin disclosed their trade secrets to the NCR defendants. (Id. ¶¶ 66-67; Doc. 33-1 ¶ 5).

As for the NCR defendants, plaintiffs claim that they received the misappropriated trade secrets and then used those trade secrets to manufacture products. Once more, the amended complaint provides no elucidation regarding when the NCR defendants first received plaintiffs' misappropriated trade secrets from Griffin or when they first used said trade secrets to manufacture products. The NCR defendants created a PowerPoint presentation in November 2016 that purportedly advertised products containing plaintiffs' trade secrets to prospective customers. (Id. ¶¶ 69; see Doc. 7). Assuming *arguendo* that this use of trade secrets constitutes one predicate act, plaintiffs nonetheless fail to identify a second predicate act postdating the DTSA's enactment. Viewed in the light most favorable to plaintiffs, these factual allegations do not set forth two predicate acts committed by Griffin or by the NCR defendants after May 11, 2016. For all of these reasons, we will dismiss plaintiffs' civil RICO claim.

Courts should grant leave to amend before dismissing a curable pleading in civil rights actions. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). Courts need not grant leave to amend *sua sponte* in dismissing non-civil rights claims pursuant to Rule 12(b)(6), Fletcher-Harlee Corp., 482 F.3d at 252-53, but leave is broadly encouraged "when justice so requires," FED. R. CIV. P. 15(a)(2). Plaintiffs' civil RICO claim is factually rather than legally deficient and,

based on the allegations set forth in the amended complaint, we find it conceivable that plaintiffs possess additional facts sufficient to cure those deficiencies. In the interest of justice, we grant plaintiffs leave to amend.

### 3. *Breach of Contract Against Griffin*

To establish a valid breach of contract claim under Pennsylvania law, a plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and[] (3) resultant damages."[9] Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) ("Meyer"); see also Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). A plaintiff asserting a breach of contract action must also plead privity between the parties, *viz.*, a formal contractual relationship or some type of connection between them. See Meyer, 137 A.3d at 1258; Phillips v. Cricket Lighters, 841 A.2d 1000, 1006 (Pa. 2003); see also Dyvex Indus., Inc. v. Agilex Flavors & Fragrances, Inc., No. 12-CV-0979, 2018 WL 1101028, at *10 (M.D. Pa. Feb. 28, 2018) (citations omitted). Griffin challenges the sufficiency of the breach of contract claim against him.

When Griffin began his employment with J.E. Baker Company in August 1980, he executed a "Secrecy Agreement" wherein he agreed not to disclose his employer's confidential information to any third party. (Doc. 33 ¶¶ 49-50; Doc. 8 at 18-19). In February 2003, Griffin signed a "Confidentiality and Noncompetition

---

[9] In challenging the sufficiency of the amended complaint, defendants rely on Pennsylvania law, and plaintiffs raise no objection. (See Doc. 40 at 19; Doc. 41 at 13-14, 16-19; Doc. 42 at 20-24). Hence, we will apply Pennsylvania law.

Agreement" with J.E. Baker Company's successor-in-interest, LWB Refractories Company. (Doc. 33 ¶ 51). In that agreement, Griffin again agreed not to disclose his employer's confidential information or "take with him any document or paper containing Confidential Information" upon cessation of employment. (Doc. 33 ¶¶ 49-50; Doc. 8 at 24). Both J.E. Baker Company and LWB Refractories Company were predecessors-in-interest to Magnesita, (Doc. 33 ¶¶ 47-48), rendering Magnesita in privity of contract with Griffin.

Griffin forwarded confidential information to his personal email account, downloaded additional information to an external hard drive, and retained that confidential information after leaving Magnesita's employ in 2014. (Id. ¶¶ 58-59, 61-65, 73-74, 151). He allegedly disclosed that information to his new employers, the NCR defendants, who did not sell fired or tempered dolomite brick products prior to hiring Griffin. (Id. ¶¶ 21, 75, 88-89, 151). Plaintiffs contend that, after bringing Griffin on board, the NCR defendants began selling both products, incorporating trade secrets obtained from Griffin, at prices "designed to siphon market share away from Magnesita . . . [to] cause price erosion for Magnesita products." (Id. ¶¶ 93-95). According to the amended complaint, Magnesita spent many years and millions of dollars developing its trade secrets and Griffin's misappropriation of those trade secrets has resulted in irreparable harm. (Id. ¶¶ 21, 39, 94, 152). Thus, plaintiffs state a plausible claim for breach of contract against Griffin.

## 4. *Lanham Act Against All Defendants*

The Lanham Act provides, in pertinent part, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Plaintiffs assert two Lanham Act claims, alleging that defendants "misdesignated the accused tempered and fired dolomite bricks and marketed and continue to market those products as authorized, approved, endorsed, or otherwise permitted by Magnesita," (Doc. 33 ¶ 163), and that defendants' presentation to Magnesita's existing and prospective customers included false or intentionally misleading statements, (id. ¶¶ 78, 84, 157). We address plaintiffs' respective Lanham Act claims for false designation and false advertising in turn.

### a.    False Designation of Origin

To state a claim for false designation of origin, plaintiffs must allege that (1) defendants used a false designation of origin; (2) defendants' use of the false designation occurred in interstate commerce in connection with goods or services; (3) the false designation "is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of [plaintiffs'] goods or services by another person"; and (4) plaintiffs are likely to be or have been damaged as a result.  See AT & T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994).  False designation claims often take one of two forms: "passing off" claims and "reverse passing off" claims.  The Supreme Court distinguished the two claims as follows: "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's.  Reverse passing off, as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 n.1 (2003).  It appears from the amended complaint that plaintiffs' claim is one for "reverse passing off."

Plaintiffs base their false designation of origin claim on a PowerPoint presentation that Tianjin showed to Magnesita's customers.  (Doc. 33 ¶¶ 78, 157; see Doc. 7).  Plaintiffs allege that Griffin assisted with creating the presentation in November 2016, some time after beginning employment with the NCR defendants.  (Doc. 33 ¶¶ 69-70).  In the PowerPoint, Tianjin represents that the NCR defendants have "Totally Foreign Upper Management," and displays photographs and brief biographies of three former Magnesita employees: Hennel, Griffin, and Greiss.  (Id.

¶¶ 78-79; Doc. 7 at 8-11).  The presentation lists various refractory products created

by the NCR defendants, including fired and tempered dolomite bricks, and then

claims that product "Formulations are all Foreign Technologies."  (Doc. 33

¶ 80; Doc. 7 at 12).  The presentation concludes with a slide listing reasons for

choosing the NCR defendants, including that Tianjin has a "Chinese produced cost

base but [is] under foreign management and Technology."  (Doc. 33 ¶ 81; Doc. 7

at 42).

We find that plaintiffs have adequately alleged defendants' false designation

of the origin of certain dolomite products.  Taking the facts in the amended

complaint as true, the presentation can be fairly interpreted to suggest either that

(1) plaintiffs consented to the use of their confidential information and technology

in the NCR defendants' products or (2) the NCR defendants' products utilize their

own "foreign technology" when, in fact, their products incorporate plaintiffs' trade

secrets and confidential information.  The identification of former Magnesita

employees in the presentation could plausibly cause confusion or mistake as to the

origin of the NCR defendants' products, especially when viewed by Magnesita's

customers.

Defendants suggest that plaintiffs' customers are sophisticated purchasers

who exercised a heightened standard of care in making purchasing decisions and

therefore are unlikely to experience confusion as to the origin, sponsorship, or

approval of plaintiffs' goods by another entity.  (Doc. 60 at 8-9 (citing Sabinsa Corp.

v. Creative Compounds, LLC, 609 F.3d 175, 186 (3d Cir. 2010))).  However, when a

buyer class consists of both professionals and ordinary customers, the likelihood of

confusion standard still controls.  See id.  At this procedural juncture, we cannot

conclude that plaintiffs' false designation of origin claim is foreclosed.[10]

   **b.**   **False Advertising**

To state a claim for false advertising, plaintiffs must plead that:

(1) defendants made false or misleading statements about their own products or

plaintiffs' products; (2) "there is actual deception or at least a tendency to deceive a

substantial portion of the intended audience"; (3) "that the deception is material in

that it is likely to influence purchasing decisions"; (4) "that the advertised goods

traveled in interstate commerce"; and (5) "that there is a likelihood of injury to the

plaintiff in terms of declining sales, loss of good will, etc." Pernod Ricard USA, LLC

v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011).  The NCR defendants argue

that the false advertising claim fails because plaintiffs have not pled that the 2016

presentation was "literally false" or "likely to mislead and confuse consumers."

(Doc. 60 at 9-10).

A commercial statement or message may constitute false advertising if it is

"(1) literally false or (2) literally true or ambiguous, but has the tendency to deceive

consumers." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck

Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002).  An advertisement that is

proved "unambiguous and literally false" is presumed to be deceptive or tending to

---

[10] We note that the NCR defendants raise this challenge to the likelihood of
confusion element of plaintiffs' claim for the first time in their reply brief, and
plaintiffs did not address the matter in their brief in opposition.  Courts generally
will not consider issues raised for the first time in a reply brief.  Bell v. Lackawanna
Cty., 892 F. Supp. 2d 647, 688 n.41 (M.D. Pa. 2012) (Conner, J.) (citations omitted).

deceive.  Pernod, 653 F.3d at 248 (citing Novartis, 290 F.3d at 586).  When an advertisement conveys a message that is "literally true or ambiguous," a plaintiff must "prove actual deception or a tendency to deceive."  Id. (citing Novartis, 290 F.3d at 586, 588-89).

The amended complaint identifies two theories of false advertising supposedly perpetrated by defendants through the 2016 presentation.  Plaintiffs aver that the presentation is false or misleading because it erroneously suggests to consumers that the NCR defendants use plaintiffs' management processes and manufacture dolomite bricks incorporating plaintiffs' technology all with plaintiffs' authorization.  (Doc. 33 ¶¶ 160-61).  And they assert that the presentation creates a false or misleading impression that "Magnesita approves, endorses, or otherwise permits the use of Magnesita technology" by the NCR defendants in the creation of their dolomite bricks.  (Id. ¶ 162).

The court cannot discern from the amended complaint a false advertising claim premised on "unambiguous and literally false" representations.  But the nature and meaning of the presentation—in isolation and absent any allegations concerning the presenter's oral statements—is inherently ambiguous.  According to the amended complaint, the presentation represents that the NCR defendants have entirely foreign upper management and then immediately displays slides containing photographs of former Magnesita employees and brief biographies which reference their respective periods of employment with Magnesita and its predecessor companies.  (Id. ¶¶ 78-79, 158; Doc. 7 at 8-11).  The presentation then lists various refractory products manufactured by the NCR defendants

using foreign technology. (Doc. 33 ¶ 80; Doc. 7 at 12). The NCR defendants purportedly gave this presentation to existing Magnesita customers. (Doc. 33 ¶¶ 78, 84). Plaintiffs allege that the order of information in the presentation has the intention to deceive existing Magnesita customers and to influence those customers to purchase TNCR's fired and tempered dolomite bricks. (See id. ¶¶ 84, 158-59, 164).

Plaintiffs sufficiently set forth a false advertising claim premised on defendants' ambiguous statements in the 2016 presentation. Following discovery, plaintiffs will bear the burden of proving that defendants' ambiguous statements regarding the source of their foreign management and foreign technology were actually deceptive or tended to deceive consumers.

> **5.** ***PUTSA Preemption and Remaining State Tort Claims Against All Defendants***

The parties do not dispute that PUTSA expressly "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." 12 PA. CONS. STAT. § 5308(a). The Act excepts only three categories of claims from the scope of its preemption power: contractual and criminal remedies, whether or not based upon misappropriation of a trade secret, and other civil remedies that are not based upon misappropriation of a trade secret. See id. § 5308(b). The parties' arguments concern whether plaintiffs' state law tort claims involve allegations beyond misappropriation of a trade secret sufficient to avoid PUTSA preemption.

Courts within the Third Circuit have construed PUTSA as preempting common law tort claims for breach of fiduciary duty and confidentiality, civil

conspiracy, unfair competition, and unjust enrichment when the court finds that the allegedly misappropriated information is indeed a trade secret. See Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 324 (M.D. Pa. 2014) (Conner, C.J.) (collecting cases). This rule of preemption assumes two overlapping contingencies: first, that the plaintiff's tort claims do not involve anything other than trade secrets and, second, that the allegedly misappropriated information is properly classified as a trade secret. See Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 620 (E.D. Pa. 2009). A plaintiff can plead common law tort claims in the alternative, as discovery may reveal that the claimed trade secrets constitute ordinary confidential or propriety information. See E. Frank Hopkins Seafood, Co. v. Olizi, No. 2:17-CV-1558, 2017 WL 2619000, at *7 (E.D. Pa. June 16, 2017) (collecting cases).

Misuse of confidential information undergirds each state law tort claim. The unfair competition claim rests on the November 2016 presentation to Magnesita's customers and purported representations about plaintiffs' confidential information made therein. Plaintiffs' conversion claim asserts that Griffin misappropriated plaintiffs' confidential information by means of email and an external hard drive and that the NCR defendants subsequently sold dolomite products incorporating that information. Plaintiffs identify misappropriation of trade secrets, unfair competition, and conversion as objects of the civil conspiracy. Absent a more developed record, we cannot determine at this juncture whether the confidential information underlying each common law tort claim qualifies as trade secrets to implicate PUTSA preemption. Moreover, dismissing plaintiffs' state law tort claims on preemption grounds at the Rule 12 stage may later deprive them of an

otherwise deserved remedy.  See Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc., No. 11-4568, 2011 WL 6046923, at *5 (E.D. Pa. Dec. 6, 2011). Therefore, we defer the question of PUTSA preemption until the summary judgment stage of this litigation.

### a.    Unfair Competition

Under Pennsylvania common law, a defendant engages in unfair competition by "passing off" a competitor's goods as his or her own, thereby creating confusion between the defendant's goods and the competitor's goods.  Giordano v. Claudio, 714 F. Supp. 2d 508, 521 (E.D. Pa. 2010) (citing Scanvec Amiable Ltd. v. Chang, 80 F. App'x 171, 180 (3d Cir. 2003) (nonprecedential)).  The Pennsylvania common law of unfair competition generally tracks federal law.  Diodato v. Wells Fargo Ins. Servs., USA, Inc., 44 F. Supp. 3d 541, 571 (M.D. Pa. 2014) (Conner, C.J.) (citations omitted). Because we have concluded *supra* that plaintiffs' Lanham Act claims survive Rule 12(b)(6) scrutiny, we will deny defendants' motion to dismiss the common law unfair competition claim on identical grounds.

### b.    Conversion

Conversion is "an act of willful interference with the dominion or control over a chattel done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession."  Baram v. Farugia, 606 F.2d 42, 43 (3d Cir. 1979); see Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. Ct. 2003).  Defendants contend that plaintiffs cannot allege facts showing that Magnesita demanded the return of its confidential information and that Griffin

refused, positing that "[d]emand and refusal is an 'essential element' of a claim for conversion." (Doc. 41 at 18; see Doc. 40 at 19). We disagree.

A person commits the tort of conversion by engaging in any of the following conduct:

> (a) Acquiring possession of the goods, with an intent to assert a right to them which is in fact adverse to that of the owner.
>
> (b) Transferring the goods in a manner which deprives the owner of control.
>
> (c) Unreasonably withholding possession from one who has the right to it.
>
> (d) Seriously damaging or misusing the chattel in defiance of the owner's rights.

Norriton E. Realty Corp. v. Cent.-Penn Nat'l Bank, 254 A.2d 637, 638 (Pa. 1969) (internal quotation marks omitted) (quoting PROSSER ON TORTS § 15 (2d ed. 1955)). When a defendant first possesses an item *rightfully*, he or she becomes a converter only after refusing to deliver the item on demand. Id. at 639 (citation omitted); see also Win & Son, Inc. v. City of Philadelphia, 178 F. Supp. 3d 234, 243 (E.D. Pa. 2016). The amended complaint alleges that Griffin *wrongfully* acquired possession of plaintiffs' confidential information by email for the purpose of delivering said information to the NCR defendants. (Doc. 33 ¶¶ 61, 63-65). The NCR defendants purportedly used that confidential information to manufacture and sell fired and tempered dolomite brick products. (Id. ¶¶ 92-94). These allegations sufficiently set forth a claim of conversion against all defendants.

### c.    <u>Civil Conspiracy</u>

To state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." <u>Gen. Refractories Co. v. Fireman's Fund Ins. Co.</u>, 337 F.3d 297, 313 (3d Cir. 2003) (quoting <u>Strickland v. Univ. of Scranton</u>, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)).  The plaintiff must also identify an underlying intentional tort or criminal act, <u>see</u> <u>Battle v. Prison Health Servs., Inc.</u>, No. 1864 WDA 2013, 2015 WL 6181266, at *5 (Pa. Super. Ct. Feb. 24, 2015) (citing <u>Nix vs. Temple Univ.</u>, 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991)); <u>see</u> <u>also</u> <u>Remick</u>, 238 F.3d at 263, and plead that the defendant acted with malice, or an intent to injure, absent justification, <u>PDC Machs.</u>, 2018 WL 3008531, at *4 (quoting <u>Thompson Coal Co. v. Pike Coal Co.</u>, 412 A.2d 466, 472 (Pa. 1979)); <u>see</u> <u>also</u> <u>Church Mut. Ins. Co. v. All. Adjustment Grp.</u>, 708 F. App'x 64, 70 (3d Cir. 2017) (nonprecedential).

Pennsylvania courts recognize the "intracorporate conspiracy doctrine," which provides that "an entity cannot conspire with one who acts as its agent." <u>Gen. Refractories</u>, 337 F.3d at 313; <u>Grose v. Procter & Gamble Paper Prods.</u>, 866 A.2d 437, 441 (Pa. Super. Ct. 2005) (citation omitted).  Employees or agents of a single entity likewise cannot conspire among themselves.  <u>Grose</u>, 866 A.2d at 441 (citation omitted).  At least one Pennsylvania appellate court has recognized an exception to the intracorporate conspiracy doctrine when an employee acts solely for their personal benefit rather than in an official company capacity.  <u>See</u> <u>Gordon</u>

v. Lancaster Osteopathic Hosp. Ass'n, Inc., 489 A.2d 1364, 1372 (Pa. Super. Ct. 1985);
but see Lilly v. Boots & Saddle Riding Club, No. 57 C.D. 2009, 2009 WL 9101459, at
*6 (Pa. Commw. Ct. July 17, 2009) (nonprecedential).

Defendants contend that plaintiffs' conspiracy claim rests entirely on the
employment relationship between Griffin and the NCR defendants.  (Doc. 41 at 19).
But the NCR defendants did not hire Griffin until *after* he returned from China
and *after* his period of self-employment from January to September 2015.  (Doc. 33
¶¶ 66-67).  Taking these facts as true, and drawing all reasonable inferences in favor
of plaintiffs, we conclude that plaintiffs set forth a viable claim for civil conspiracy.
It is plausible that the alleged conspiratorial agreement predated Griffin's
employment with the NCR defendants, originating either during Griffin's time in
China or his period of self-employment.  Consequently, we need not address the
viability or applicability of the exception to the intracorporate conspiracy doctrine
at this stage of the litigation.

## IV.    Conclusion

The court will deny defendants' motions to the extent brought pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) except as to plaintiffs' civil RICO claim in Count III.  The court will defer ruling on the NCR defendants' Rule 12(b)(2) motion pending a period of jurisdictional discovery, which will illuminate whether the court possesses specific personal jurisdiction or general alter ego jurisdiction over New Century.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    February 28, 2019